UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ERIC D. HOVDE, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 23-cv-14263 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| EDWARD D. FREUD, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Isla Mujeres is nestled in the turquoise waters of the Caribbean Sea, just off the shores of Cancun, Mexico. It has sandy beaches, a sea turtle sanctuary, and palm trees aplenty. Isla Mujeres is a vacationer's paradise. But for Plaintiffs Eric and Steven Hovde, Isla Mujeres represents something entirely different: a money pit and a font of endless litigation.

The story began in the mid-2000s. Jeffrey Riegel decided to build a condominium complex on the island. To fund the project, the Hovdes loaned $2.5 million to Riegel's company, ISLA Development LLC. Then, the Great Recession hit – and it hit ISLA like a hurricane.

ISLA attempted to get things back on track. Along the way, it borrowed more funds from the Hovdes. The aggregate principal ballooned to more than $4.3 million.

In September 2008, Riegel emailed the Hovdes to let them know that things had gone south, and that the money had dried up. He didn't have the money to complete the project or repay the Hovdes. But two months later, on November 5, 2008, Riegel secured a potential temporary lifeline. Riegel obtained a $2.8 million bridge loan from MAKA Real Estate, LLC, hoping to keep things afloat until he got a construction loan.

Based on the MAKA loan, the Hovdes and ISLA entered into a forbearance agreement on November 5, 2008.  In that agreement, the Hovdes agreed to hold off on suing ISLA for repayment.  In return, ISLA would repay the Hovdes, either after obtaining a construction loan or through liquidation/sale.

In the end, ISLA did not obtain the construction loan, so the project collapsed.  The Hovdes lost millions of dollars.  One might think that the Hovdes would have rushed to the courthouse in an effort to obtain repayment.  But that's not what happened.

Years passed.  Ten years, actually.  On November 2, 2018, the Hovdes finally brought a lawsuit against Riegel and ISLA in the Northern District of Illinois.  That case was the first of two lawsuits (the case at hand is the second).

The statute of limitations loomed large.  Illinois imposes a 10-year statute of limitations in lawsuits seeking repayment on notes.

At best, the filing of the complaint on November 2, 2018 cut it close.  If the clock started ticking on the day of the forbearance agreement (November 5, 2008), then a complaint filed on November 2, 2018 barely met the deadline.  At worst, the filing was too late.  If the clock started ticking on the date of the email in September 2008, then a complaint filed on November 2, 2018 was two months too late.

At summary judgment, Judge Lee dismissed the Hovdes' complaint as time-barred.  The court decided that the 10-year statute of limitations started ticking when Riegel sent his email about the inability to pay in September 2008.  Ten years and two months had passed since that email, so the limitation period had run.

In the district court, the Hovdes were represented by Defendant Edward Freud of the law firm Ruff, Freud, Breems & Nelson, Ltd.  But the Hovdes obtained new counsel for their appeal.

And their new counsel raised a new argument: the November 2008 forbearance agreement reset the clock.

On appeal, it was too late to raise a new argument about whether the Hovdes had filed the lawsuit too late. The Seventh Circuit concluded that the Hovdes had waived any argument about the forbearance agreement, and affirmed the district court. So, the Hovdes' position went from bad to worse. The money pit now included litigation expenses, in addition to the loan money.

Unsatisfied by the unhappy ending, the Hovdes filed a second lawsuit, meaning the case at hand. The Hovdes sued Freud and his firm, alleging professional negligence (*i.e.*, legal malpractice). Defendants moved to dismiss. They believe that the forbearance agreement did not restart the limitation period.

For the following reasons, Defendants' motion to dismiss is denied.

## Background

At the motion-to-dismiss stage, the Court must accept as true the complaint's well-pleaded allegations. *See Lett v. City of Chicago*, 946 F.3d 398, 399 (7th Cir. 2020). The Court "offer[s] no opinion on the ultimate merits because further development of the record may cast the facts in a light different from the complaint." *Savory v. Cannon*, 947 F.3d 409, 412 (7th Cir. 2020).

This case is about legal malpractice in litigation over a loan agreement. To understand the claim, the reader needs to understand the loan agreement and the first round of litigation, plus the allegations in the case at hand.

***The Loan Agreement***

In the mid-2000s, Jeffrey Riegel had an idea. *See Hovde v. Isla Dev. LLC* (*Hovde I*), 2020 WL 4430565, at *1 (N.D. Ill. 2020). He wanted to build a condominium complex on Isla Mujeres, an island several miles off the coast of Cancun, Mexico. *Id.*

Established as a fishing village in the 19th century, Isla Mujeres is now a tourist hotspot, with luxury hotels, beach clubs, and robust nightlife. *See* Meagan Drillinger, *How to Plan the Perfect Trip to Isla Mujeres, Mexico*, Travel + Leisure (July 12, 2023), https://www.travelandleisure.com/how-to-visit-isla-mujeres-mexico-7559812. The island spans only five and a half miles but offers no shortage of attractions, from an underwater sculpture museum to swimming with whale sharks. *Id.*

Riegel formed ISLA Development LLC to purchase and develop land on the island. But Riegel needed cash to jumpstart his plan.

Plaintiffs Eric and Steven Hovde offered help. *See* Cplt., at ¶ 14 (Dckt. No. 1). The Hovdes loaned ISLA $2.5 million to fund the project. *Id.* Riegel agreed to personally guaranty the loan. *Id.*

The Hovdes made the loan in 2005. *Id.* The Note provided that the principal and interest on the loans would be payable in June 2007. *Id.* at ¶ 15. But the Note included an acceleration clause for "Events of Default." *Id.* at ¶ 16.

Under that clause, if an event of default occurred, then the money was due then and there. "[T]he outstanding unpaid principal balance of the Note, the accrued interest thereon and all other obligations of the Borrower to the Bank under the Loan Documents shall automatically become immediately due and payable." *Id.* In other words, after an event of default, the Hovdes could immediately demand payment under the Note. *Id.*

4

The Note defined events of default. *Id.* The definition included an "Act of Bankruptcy." *Id.* The phrase "Act of Bankruptcy" was not limited to a filing in bankruptcy court. The Note defined "Act of Bankruptcy" to include a circumstance where ISLA or Riegel "admit in writing [their] inability to pay [their] debts as they mature." *Id.*

The mid-2000s weren't the best time for real estate development. The Great Recession threw a financial wrench at the project. *Id.* at ¶ 17. Given ISLA's financial troubles, the Hovdes and ISLA renegotiated the Note several times between July 2007 and April 2008. *Id.* The Hovdes loaned ISLA additional funds, too. *Id.* After the amendments and additional loans, ISLA owed the Hovdes an aggregate principal amount of $4,394,821. *Id.*

On September 2, 2008, Riegel emailed the Hovdes to warn them that he was in dire financial straits. *Id.* at ¶ 18. Riegel described the severity of the situation in no uncertain terms. He wrote: "At this point in time, my resources are exhausted." *Id.*

Riegel's email included specifics, too. He informed the Hovdes that he had suspended all construction workers two weeks earlier, and that he had kept on management staff but stopped paying them. *Id.* Riegel explained that, if he fired the construction workers and management staff, he would have to pony up between $200,000 and $250,000 for severance and federal taxes. *Id.*

According to Riegel's email, he needed $75,000 within days to avoid having his operation shut down by Social Security personnel in Mexico. *Id.* In fact, Riegel was told that trucks would confiscate items from his office and construction site to pay the Social Security bill that ISLA owed – thus spelling the end of the project. *Id.* Riegel wrote that he was a "very stand up guy" but lacked the resources to reassemble a team and get the project back on track. *Id.*

Fast-forward a couple of months.  On November 5, 2008, the Hovdes and ISLA entered into a forbearance agreement.  *Id.* at ¶ 19.  The Hovdes "agree[d] to forebear [sic] from exercising [their] remedies pursuant to the Hovde Loan Agreement."  *See* Forbearance Agreement, at § 4 (Dckt. No. 1-3).

Basically, two non-parties to the loan agreement, Jennifer and Kevin Amys of MAKA Real Estate, LLC, agreed to make a bridge loan.  They agreed to loan $2.7 million to ISLA "for the sole purpose of obtaining a construction loan" on the property from USA Global Holdings Business Trust.  *Id.* at 1.  They also agreed to loan an additional $100,000 as a "bridge loan" to provide "short term financing while the construction loan [was] finalized."  *Id.* at 2.

The Hovdes agreed to forbear until the earlier of December 31, 2008, or whenever USA Global gave notice that it would not fund the construction loan.  *Id.* at § 4.

The forbearance agreement covered what would happen in two potential scenarios.  The first was the "Construction Loan Scenario."  And the second was the "Sale/Liquidation Scenario."  Basically, the forbearance agreement addressed how things would shake out if ISLA obtained a construction loan, or didn't obtain a construction loan.

If the USA Global construction loan went through, the Hovdes would get paid.  The first draw of the construction loan would "pay off all principal and accrued interest then due pursuant to the Hovde Loan."  *Id.* at § 1; *see also id.* at § 3 (stating that, upon the closing of the construction loan, the Hovdes would "receive[] a payment from USA Global in the first draw on the Construction Loan to repay the principal and all outstanding accrued interest on the Hovde Loan Agreement").

If the construction loan did not go through, the ISLA property would be liquidated.  *Id.* at § 2.  And MAKA as the bridge lender would have a preferred spot in line.  MAKA would

6

receive 33.3% of the net proceeds until the amount of the loan principal was reached. *Id.* The Hovdes would stand second in line. *Id.* MAKA would receive interest only after the Hovdes were "repaid in full" on both the principal and the interest. *Id.*

In the end, ISLA never completed the construction project. *See* Cplt., at ¶ 20 (Dckt. No. 1). And the Hovdes never received the millions of dollars owed by ISLA. *Id.*

As an aside, the parties don't tell the rest of the story about what happened to the project, except to say that things ended badly. Any interested reader is left marooned on an island, wondering what happened.

This Court figured out the end of the story by looking at the filings on the docket in the Seventh Circuit. (More on that appeal later). Basically, the construction loan fell through, and the project fell apart.

***The Underlying Lawsuit***

On November 2, 2018, the Hovdes filed the first lawsuit, bringing two claims against ISLA and Riegel in the Northern District of Illinois. *Id.* at ¶ 21. Count I alleged that ISLA had breached the Note. *Id.* Count II alleged that Riegel had breached the Guaranty. *Id.*

The parties filed cross motions for summary judgment. *Id.* The Hovdes contended that "there was no dispute that ISLA and Riegel were liable on the Note and Guaranty." *Id.* ISLA and Riegel argued that the Hovdes' claims were time-barred. *Id.*

The key question was whether the September 2008 email was an "event of default" within the meaning of the Note.

If so, then all of the money owed to the Hovdes was immediately due and payable. That is, if Riegel's email counted as an "event of default" – and thus accelerated ISLA's debt under

the Note – then the statute of limitations began running in September 2008. At that point, the 10-year clock would start ticking.

Doing some quick math, September 2008 to November 2018 is ten years and two months. That's more than 10 years. So, if the clock started running in September 2008, then the Hovdes' claim would be time-barred.

Judge Lee granted ISLA's motion for summary judgment on the Note. *See Hovde I*, 2020 WL 4430565, at *1. The court concluded that Riegel's September 2008 email was an event of default under the Note and accelerated ISLA's debt. *Id.* at *7. The statute of limitations started to run in September 2008.

Judge Lee opined that the forbearance agreement from November 2008 did not toll the limitation period. *Id.* at *6. Notice that the issue was *tolling*. Tolling means stopping the clock, not resetting the clock.

In the end, Judge Lee concluded that, because the limitation period began to run in September 2008, and the Hovdes waited until November 2018 to sue, the Hovdes' claim on the Note was time-barred. *Id.* at *7.

Judge Lee also granted the Hovdes' motion for summary judgment on their claim against Riegel about the Guaranty. *Id.* The court concluded that the Guaranty explicitly waived the statute of limitations defense. *Id.*

Riegel moved for reconsideration on the grant of summary judgment to the Hovdes on the Guaranty. *See* Cplt., at ¶ 23 (Dckt. No. 1). Judge Valderrama (the judge after reassignment from Judge Lee) granted Riegel's motion. *See Hovde v. ISLA Dev. LLC* (*Hovde II*), 2021 WL 4477912, at *1 (N.D. Ill. 2021). Judge Valderrama concluded that the Guaranty did not contain

a clause that was explicit enough to function as a waiver of the statute of limitations defense. *Id.* at *9.

In the district court, counsel for the Hovdes may have left some meat on the table. Counsel did not argue that the November 2008 forbearance agreement reset the clock on the statute of limitations.

A 10-year limitation period applies to actions about notes. *See* 735 ILCS 5/13-206. A claim becomes time-barred when "a continuous period of 10 years" passes without the lender receiving or demanding payment. *Id.* However, if "any payment or new promise to pay has been made . . . within or after the period of 10 years," that payment or promise to pay resets the clock. *Id.*

If the November 5, 2008 forbearance agreement constituted a "new promise to pay," then it reset the clock. *Id.* And resetting the clock would change the outcome under the 10-year statute of limitations.

Again, the forbearance agreement was dated November 5, 2008, and the complaint was filed on November 2, 2018. The complaint was filed only a few days shy of the 10-year mark. So, if the forbearance agreement reset the clock, then the Hovdes' claim would not be time-barred.

The district court did not address whether the forbearance agreement reset the clock, for a simple reason. The Hovdes never raised it.

The Hovdes appealed to the Seventh Circuit. *See* Cplt., at ¶ 24 (Dckt. No. 1); *see also Hovde v. ISLA Dev. LLC* (*Hovde III*), 51 F.4th 771, 773 (7th Cir. 2022).

In the district court, the Hovdes were represented by Defendant Edward Freud, of the law firm Ruff, Freud, Breems & Nelson, Ltd. (also a Defendant). *See Hovde I*, 2020 WL 4430565;

9

*Hovde II*, 2021 WL 4477912. But the Hovdes retained new counsel for their appeal: Carson Veach and Paul Hudson of Miller Canfield Paddock & Stone. *See Hovde III*, 51 F.4th at 773.

The Hovdes' new counsel unveiled a new legal theory on appeal. For the first time, the Hovdes argued that the forbearance agreement constituted a "new promise to pay," resetting the clock and making their lawsuit timely. *See id.* at 774.

That argument was a new twist on the forbearance agreement. In the district court, the Hovdes made an argument about tolling. They argued that the forbearance agreement "temporarily tolled the running of the statute of limitations thus extending the ten-year limit." *Id.* But the Hovdes did not argue (in the district court) that the forbearance agreement constituted a "new promise to pay." *Id.*

Tolling is like pressing pause on a TV remote – the clock stays put, but it doesn't start fresh. A "new promise to pay," by contrast, is like rewinding to the start of a video: the clock starts back at 0:00. Because of that difference, the Seventh Circuit concluded that the tolling argument and the "new promise to pay" argument were separate arguments. *Id.*

A new argument can't be raised on appeal, so the argument was doomed. The Seventh Circuit concluded that the Hovdes had waived any argument that the forbearance agreement was a new promise to pay. *Id.* at 775. The Seventh Circuit declined to address it on the merits. *Id.*

The Seventh Circuit ultimately affirmed the grant of summary judgment to Riegel and ISLA. *See* Cplt., at ¶ 24 (Dckt. No. 1).[1]

---

[1] For over a decade, the Hovdes have battled in court about the Isla Mujeres project. The litigation is sprawling and has a cross-border flair, taking place in both the United States and Mexico. While the Dirksen Federal Building is about 3,000 miles away from Isla Mujeres, this courthouse is a hotspot for Isla Mujeres litigation. In addition to this case and the underlying suit, the Hovdes have a pending tortious interference with contract claim against Rainer Hummel, a commercial real estate developer who financed ISLA's legal defense, in this district. *See Hovde v. Hummel*, 24-cv-638 (N.D. Ill.).

***This Lawsuit***

The Hovdes responded to their Seventh Circuit loss by heading back to the courthouse and filing a second lawsuit, meaning the case at hand. This time, the Hovdes took aim at their counsel, suing Edward Freud and Ruff, Freud, Breems & Nelson, Ltd. (For simplicity's sake, the Court refers to Freud and his firm collectively as "Freud.").

In the Hovdes' view, Freud committed professional negligence by failing to argue in the ISLA litigation that the forbearance agreement dated November 5, 2008 constituted a new promise to pay the Note. *Id.* at ¶¶ 25, 31.

The complaint in the case at hand includes only one count, a claim about professional negligence (*i.e.*, legal malpractice) under Illinois law. *Id.* at ¶¶ 34–41. The Hovdes claim that they lost the ability to recover $4,394,821 (plus interest) that ISLA owed them under the Note. *Id.* at ¶ 41. As they see it, they suffered that loss because of Freud's failure to raise the argument about the forbearance agreement. In addition, the Hovdes believe that they were forced to pay "unnecessary legal fees and expenses" in the ISLA litigation because of Freud's negligence. *Id.*

The Hovdes seek compensatory damages. *Id.* at 8. They also want repayment of the fees and costs associated with the ISLA litigation, along with attorneys' fees and costs in the case at hand. *Id.*

As an aside, one wonders why the Hovdes filed the first lawsuit (against ISLA) on November 2, 2018, unless they thought that they needed to file suit by November 5, 2018, meaning 10 years after the forbearance agreement dated November 5, 2008. Based simply on the timing, it sure looks like the Hovdes filed suit in early November 2018 to meet a deadline of November 5, 2018. Then again, if the Hovdes' counsel believed that November 5, 2008 was the starting point for the statute of limitations, then one wonders why they didn't make that argument

in the first lawsuit. Maybe counsel had tolling in mind (*i.e.*, stopping the clock), but did not consider whether the forbearance agreement was a new promise to pay (*i.e.*, resetting the clock). Or maybe the timing is a coincidence.

In any event, Freud moved to dismiss. *See* Defs.' Mtn. to Dismiss (Dckt. No. 11). Freud argues that the Hovdes have no claim because the forbearance agreement did not constitute a "new promise to pay." *Id.* at 1. Freud also argues that the forbearance agreement was unenforceable as a matter of law because Eric Hovde did not sign it. *Id.* at 2.

## Legal Standard

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not the merits of the case. *See* Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a motion to dismiss, the Court must accept as true all well-pleaded facts in the complaint and draw all reasonable inferences in the plaintiff's favor. *See AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011).

To survive, the complaint must give the defendant fair notice of the basis for the claim, and it must be facially plausible. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

"When ruling on a motion to dismiss, the court may consider 'documents . . . attached to the complaint, documents . . . central to the complaint and . . . referred to in it, and information that is properly subject to judicial notice.'" *Amin Ijbara Equity Corp. v. Vill. of Oak Lawn*, 860 F.3d 489, 493 n.2 (7th Cir. 2017) (quoting *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013)). "[I]t is a well-settled principle that the decision of another court or agency . . . is a

proper subject of judicial notice." *Opoka v. I.N.S.*, 94 F.3d 392, 394 (7th Cir. 1996); *see also Ewell v. Toney*, 853 F.3d 911, 917 (7th Cir. 2017).

## Analysis

This case is about professional negligence. Because this is a diversity case, "Illinois' substantive law governing legal malpractice applies." *UFT Com. Fin., LLC v. Fisher*, 991 F.3d 854, 857 (7th Cir. 2021).

"A claim for legal malpractice requires (1) an attorney-client relationship, (2) a duty arising from that relationship, (3) a breach of that duty, and (4) actual damages or injury proximately caused by the breach." *Zweig v. Miller*, 182 N.E.3d 159, 166 (Ill. App. Ct. 2020); *see also Sexton v. Smith*, 492 N.E.2d 1284, 1286 (Ill. 1986).

The proximate causation element requires a close look at the underlying lawsuit. "If the underlying action never reached trial because of the attorney's negligence, the plaintiff is required to prove that but for the attorney's negligence, the plaintiff would have been successful in that underlying action. A legal malpractice plaintiff must therefore litigate a 'case within a case.'" *Tri-G, Inc. v. Burke, Bosselman & Weaver*, 856 N.E.2d 389, 395 (Ill. 2006); *see also Stevens v. McGuireWoods LLP*, 43 N.E.3d 923, 927 (Ill. 2015) ("The basis of a legal malpractice claim is that, absent the former attorney's negligence, the plaintiff would have been compensated for an injury caused by a third party.").

In a malpractice case, the issue is whether the plaintiff would have won the case but for their attorney's negligence. *See Orzel v. Szewczyk*, 908 N.E.2d 569, 575 (Ill. App. Ct. 2009). It requires wandering into a hypothetical universe and pondering "what might have been."

The Hovdes can't win this legal malpractice case without showing that Freud made them lose the first case. They must show that Freud's mistake caused their loss, and that they would have prevailed in the lawsuit but for the negligence.

The Hovdes allege that Freud messed up by failing to "raise basic evidence" about the forbearance agreement. *See* Cplt., at ¶ 3 (Dckt. No. 1). In their view, the forbearance agreement was a new promise to pay that reset the clock on the statute of limitations. *Id.* at ¶ 26. They contend that Freud committed professional negligence when he failed to raise that argument. *Id.* at ¶ 31.

So, the Court must consider a "but-for" world in which Freud made an argument about the forbearance agreement. Maybe the failure to make that argument cost the Hovdes something. Or maybe it didn't. It depends on whether the argument was a winning argument.

If the forbearance agreement was not a new promise to pay, then Freud's failure to make that argument would have made no difference. A failure to make a losing arguing isn't a basis for a malpractice claim.

But if the forbearance agreement was a new promise to pay, then Freud missed a winning argument on the statute of limitations. The argument would have allowed the lawsuit to continue to go forward. It wouldn't mean that the Hovdes would have won the case if Freud had made the argument. Maybe they would have lost anyway. But it would mean the Hovdes shouldn't have lost on statute of limitations grounds.

Freud thinks that the Hovdes are wrong for two reasons. First, he believes that the forbearance agreement did not reset the clock because it wasn't a "new promise to pay." *See* Defs.' Mem. in Support of Mtn. to Dismiss, at 6 (Dckt. No. 12). Basically, he alleges that the failure to make the argument caused no harm because it was a losing argument. Second, he

argues that the forbearance argument was unenforceable because Eric Hovde did not sign it. *Id.*
at 9.

The Court will address each argument in turn.

## I. Whether the Forbearance Agreement Constituted a "New Promise to Pay"

The first question is whether the forbearance agreement included a new promise to pay
the debt, and thus restarted the 10-year statute of limitations.

In Illinois, a 10-year limitation period applies to suits about notes.[2] *See* 735 ILCS 5/13-
206. But if a "new promise to pay" is made "within or after the period of 10 years," that promise
restarts the clock. *Id.* A new promise to pay rewinds the tape and kicks off a new 10-year
period.

In the first case, Judge Lee addressed the forbearance agreement in his ruling on the cross
motions for summary judgment. The ruling noted that the forbearance agreement "broadly
require[d] that the Hovdes refrain from exercising any 'remedies' created by the Note." *See
Hovde I*, 2020 WL 4430565, at *6. Because of that requirement, "it follow[ed] that [the Hovdes]
could not have demanded payment under the Note's Events of Default provision while the
Forbearance Agreement remained in force." *Id.*

However, Judge Lee did not address whether the forbearance agreement constituted a
new promise to pay, and thus reset the clock for the statute of limitations. The Seventh Circuit
didn't address it, either. *See Hovde III*, 51 F.4th at 774–75. No one raised it (in a timely manner,
that is), so no court decided it.

---

[2] The loan agreement contains a choice of law provision stating that "this agreement and the obligations
arising hereunder shall be governed by, and construed in accordance with, the laws of the state of
Illinois . . . ." *See* Loan Agreement, at ¶ 19(a) (Dckt. No. 1-1). The parties in the underlying litigation
did "not dispute that Illinois law applies, or that the accrual of the Hovdes' claim turns on Illinois law."
*See Hovde I*, 2020 WL 4430565, at *3 n.8.

This Court has a first stab at that question.

"A new promise to pay a past-due debt which removes a case from the running of the statute of limitations is unlike a normal bargain in that it creates a new debt without creating new reciprocal rights. Essentially, it revives an old debt conclusively presumed paid after the statute of limitations has expired; and this revival can be accomplished only by an explicit agreement." *Axia Inc. v. I.C. Harbour Const. Co.*, 501 N.E.2d 1339, 1344 (Ill. App. Ct. 1986) (citations omitted); *see also Richards v. Burgett, Inc.*, 2011 WL 6156838, at *5 (N.D. Ill. 2011).

If the debt is "identified with such certainty as will clearly determine its character" and the debtor shows "a present, unqualified willingness and intention to pay, that is sufficient to constitute the new promise." *Boatmen's Bank of Mount Vernon v. Dowell*, 567 N.E.2d 739, 744 (Ill. App. Ct. 1991) (citations omitted).

Basically, the limitation period won't restart without an explicit agreement to pay the debt. *See Axia Inc.*, 501 N.E.2d at 1344; *see also Richards*, 2011 WL 6156838, at *5. Put another way, "[t]he dispositive question is whether [the defendant] manifested his intent to honor his prior promise in such a way as to justify the plaintiff in understanding that a commitment had been made." *Guliana v. Kandu*, 2021 IL App (1st) 200844-U, ¶ 17.

The text of the forbearance agreement provides the answer. The agreement contemplated two scenarios: the "Construction Loan Scenario" and the "Sale/Liquidation Scenario." *See* Forbearance Agreement, at 2 (Dckt. No. 1-3). Under both scenarios, ISLA revealed an intention to repay the Hovdes.

Under the construction loan scenario, MAKA (again, the real estate firm of Jennifer and Kevin Amys) agreed to lend funds to ISLA "for the sole purpose of obtaining the Construction Loan" from USA Global. *Id.* at § 1. After securing the loan, ISLA would use the first draw to

16

"pay off all principal and accrued interest then due pursuant to the Hovde Loan." *Id.* In addition, the Hovdes would release the loan agreement and their "50%[] share of the profits from the sale of profits" of ISLA. *Id.*

So, under the construction loan scenario, ISLA intended to pay the Hovdes.

The other scenario, the sale/liquidation scenario, addressed what would happen if the construction loan did not close. *Id.* at § 2. In that scenario, the parties agreed to "consent to the liquidation of the Property by Hovde." *Id.*

Under the sale/liquidation scenario, the Hovdes agreed that – even though they had the first mortgage on the property – MAKA would get 33.3% "of all net proceeds from the liquidation or other payment for the Property as received by Hovde up to the amount of the outstanding principal balance." *Id.* MAKA would receive interest only after "Hovde has been repaid in full its principal and interest." *Id.* True, the Hovdes would stand second in line – but the key point is that they had a spot in line.

So, under the sale/liquidation scenario, ISLA intended to pay the Hovdes (but they would stand second in line).

Viewing both scenarios together, the forbearance agreement was a new promise to pay. The forbearance agreement did not walk away from the debt to the Hovdes. Quite the opposite – the forbearance agreement confirmed it. The agreement contemplated two plans, and both plans involved repaying the Hovdes.

Under one scenario, ISLA would get a construction loan and "pay off all principal and accrued interest then due pursuant to the Hovde Loan." *Id.* at § 1. Under the other scenario, ISLA would not get a construction loan, and the Hovdes would be "repaid in full" after repaying MAKA's bridge loan. *Id.* at § 2.

17

The choice was repayment or repayment. Either way, ISLA intended to honor the debt. The agreement showed a "present, unqualified willingness and intention to pay," so it constituted a "new promise." *Boatmen's Bank of Mount Vernon*, 567 N.E.2d at 744.

The rest of the forbearance agreement does not change the conclusion. After discussing the two scenarios, the forbearance agreement included a section titled "**Amendment of Hovde Loan Agreement**." *See* Forbearance Agreement, at § 3 (Dckt. No. 1-3). That section provided that, after closing the construction loan, the Hovdes would agree to eliminate ISLA's "obligation pursuant to the Hovde Loan Agreement to pay Hovde a percentage of the net profits" of ISLA. *Id.*

The next section was titled "**Hovde Forbearance**." *Id.* at § 4. That section provided that the Hovdes would agree to "forebear [sic] from exercising [their] remedies pursuant to the Hovde Loan Agreement" until the earlier of two dates: the closing of the construction loan, or notice from USA Global that it would not fund that loan. *Id.*

Further down, the agreement contained a section titled "**No Waiver**." *Id.* at § 7. That section provided: "Nothing contained in this Agreement shall constitute a waiver of any rights that Hovde has pursuant to the Hovde Loan Agreement, the Hovde Mortgage, the Pledge Agreement, or the Riegel Guaranty, except as specifically agreed to herein." *Id.*

The forbearance agreement stated the exact amount ISLA borrowed from the Hovdes under the loan agreement and amendments to that agreement: $4,417,321.30. *See id.* at 1. ISLA also owed the Hovdes $3,348,879.45 in accrued interest. *Id.*

As Freud sees things, the forbearance agreement does not include promises from the borrower. *See* Defs.' Mem., at 8 (Dckt. No. 12). In his view, the *Hovdes* agreed to forbear from exercising their remedies under the loan agreement. *Id.* But the *borrower* (*i.e.*, ISLA and

18

Riegel) made no promises about paying. *Id.* Therefore, Freud believes that the forbearance agreement does nothing more than change the timing of the remedies available to the Hovdes in the loan agreement. *Id.*

That argument is hard to square with the language of the forbearance agreement. ISLA signed the forbearance agreement, and the agreement revealed ISLA's intention to repay the debt.

Freud points out that repayment under the forbearance agreement depended on the satisfaction of contingencies. *See* Defs.' Mem., at 8 (Dckt. No. 12). Specifically, the construction loan scenario would only occur if a handful of contingencies took place. *Id.* In a similar vein, the sale/liquidation scenario depended on whether "the MAKA Investment Loan has been made." *See* Defs.' Reply, at 2 (Dckt. No. 19) (citing Forbearance Agreement, at 2 (Dckt. No. 1-3)).

To be sure, the agreement did not guarantee repayment. Contingencies stood in the way. Even so, the existence of risk of non-payment is not the right focal point. The key point is that the forbearance agreement revealed an intention by ISLA to repay the debt.[3] When it comes to a new promise to pay, the intent to repay is what matters, not the certainty of repayment.

---

[3] As an aside, the complaint and its attachments do not shed light on whether the construction loan (or the bridge loan, for that matter) ever came to fruition. But after reviewing the parties' briefs in the underlying litigation, the Court has a better sense of what happened. By the look of things, ISLA and the Hovdes entered into the forbearance agreement based on the MAKA loan and the potential construction loan. *See* Brief for Appellants, at 6, *Hovde III*, 51 F.4th 771 (2022) (No. 21-2894), 2022 WL 541147, at *6. Before signing the forbearance agreement, Steven Hovde confirmed with Riegel that "there [were] no outstanding payables or liens that will not be satisfied in full from the MAKA Bridge Loan." *Id.* A couple of weeks after the parties signed the forbearance agreement, Riegel emailed Steven Hovde stating that MAKA had funded the loan. *Id.* But the funding fell through (maybe that means the bridge loan, or the construction loan). *Id.* In December 2008, Riegel emailed Steven Hovde to let him know that he wasn't "pursuing anything further" with the potential lenders (besides litigation). *Id.* There is undoubtedly more to the story. That said, the Court is not considering these facts – which appear only in the appellate briefs in the underlying litigation – in ruling on the motion to dismiss. The Court offers these facts simply to fill in any readers curious about the MAKA puzzle piece.

19

The Hovdes analogize to *Guliana*, 2021 IL App (1st) 200844-U. In that case, the defendant sent a letter indicating an intent to use proceeds from the sale of two properties to "pay back" cashier's checks to the plaintiff "to satisfy all the past payment." *Id.* at ¶ 17. The court concluded that the letter sufficiently acknowledged a debt and stated an intention to repay the debt. *Id.* So, the plaintiff "was justified in understanding that written promise to be a commitment to repay him." *Id.*

Likewise, in the case at hand, the forbearance agreement clearly identifies the amount owed by ISLA to the Hovdes. The written agreement also contemplates repayment. So, the agreement supports the Hovdes' understanding that ISLA intended to repay them.

Freud leans heavily on two cases to support his position, but neither lends a hand.

The first case is *Axia Inc. v. I.C. Harbour Const. Co.*, 501 N.E.2d 1339 (Ill. App. Ct. 1986). In that case, the plaintiff alleged that the defendant performed shoddy work under a construction contract, necessitating corrective work. *Id.* at 1341–42. After back-and-forth between the parties, the plaintiff hired someone else to perform the corrective work. *Id.* at 1342.

*Axia* did not involve a past due debt. It concerned "only an attempt by [the defendant] to alleviate existing problems with its construction of the building, not an attempt to create a new bargain." *Id.* at 1344.

By contrast, this case *does* involve a new bargain. The forbearance agreement allegedly created two circumstances under which the Hovdes would get paid. It revealed a new intent to repay an old loan.

Freud's analogy to *Brenner Group* is not persuasive, either. *See Brenner Grp. v. Seaboard Sur. Co.*, 2001 WL 527437 (N.D. Ill. 2001). The court in *Brenner Group* pointed out

that the debt was "not referred to in any way in the writing on which plaintiff relies to toll the statute of limitations." *Id.* at *3.

The *Brenner Group* court concluded that language stating "we are processing your other invoices and will forward payment shortly" did not indicate a "manifestation of a definite and unqualified intention" to pay the claim. *Id.* Basically, the court believed that the language in question could be referring to another claim, not the debt at the heart of the litigation. *Id.*

The forbearance agreement between ISLA and the Hovdes said something different. It referred with particularity to the loan agreement and its amendments. *See* Forbearance Agreement, at 1 (Dckt. No. 1-3). In addition, the forbearance agreement contemplated two specific scenarios for repayment of that debt, rather than referring broadly to multiple payments owed.

In sum, viewing the allegations in the light most favorable to the Hovdes (as the Court must at the motion-to-dismiss stage), the complaint adequately alleges that the forbearance agreement functioned as a "new promise to pay."

## II.   Whether the Forbearance Agreement Was Unenforceable Because Eric Hovde Didn't Sign It

Next, Freud calls into question the enforceability of the forbearance agreement. Freud argues that the forbearance agreement could not have constituted a "new promise to pay" because Eric Hovde did not sign it. *See* Defs.' Mem., at 10 (Dckt. No. 12).

According to Freud, Eric Hovde's signature was a "necessary element" of the agreement. *Id.* In Freud's view, without a signature from Eric Hovde, acceptance wasn't complete. *Id.* Freud thinks that the lack of signature makes the agreement unenforceable. *Id.*

Freud's argument goes nowhere. The statute refers to a "new promise to pay," not a new agreement to pay. *See* 735 ILCS 5/13-206. A promise is an expression of intent. The statute does not require an agreement. A promise will suffice.

Here, the forbearance agreement applied to both "Eric D. Hovde and Steven D. Hovde." *See* Forbearance Agreement, at 1 (Dckt. No. 1-3). The agreement referred to them collectively as "Hovde," and Steven D. Hovde signed on behalf of "Hovde," meaning both of them. So, the agreement was a promise by both of the Hovdes.

And in any event, Freud's argument would not get anywhere at the motion-to-dismiss stage, even if the statute required a new agreement.

"The elements of a contract are an offer, acceptance, and consideration." *BMO Harris Bank, N.A. v. Porter*, 106 N.E.3d 411, 421 (Ill. App. Ct. 2018). The question here is whether Eric Hovde accepted the contract without personally signing it. *See* Defs.' Mem., at 10 (Dckt. No. 12).

Not every valid contract requires a signature. *See Wheeling Park Dist. v. Arnold*, 7 N.E.3d 77, 82 (Ill. App. Ct. 2014). Instead, a contract's language "can govern the mode of acceptance required." *Nationwide Com. Co. v. Knox*, 293 N.E.2d 638, 640 (Ill. App. Ct. 1973).

Additionally, "[i]f a document is signed by the party being charged, the other party's signature is not necessary if the document is delivered to that party and it indicates acceptance through performance." *23-25 Bldg. P'ship v. Testa Produce, Inc.*, 886 N.E.2d 1156, 1163 (Ill. App. Ct. 2008).

Turning to the forbearance agreement, it contains language that seems to require a signature for execution.

The last substantive page of the forbearance agreement states: "**IN WITNESS WHEREOF,** the undersigned have executed this Agreement as of the day and year first set forth above." *See* Forbearance Agreement, at 5 (Dckt. No. 1-3). Text below reads: "[*SIGNATURE PAGES FOLLOW*]." *Id.*

As advertised, a signature page comes next, accompanied by a header reading "**BORROWER**." *Id.* at 6. Two signatures of Riegel's appear below, on behalf of "ISLA DEVELOPMENT, LLC" and "ISLA DEVELOPMENT MEXICO, S. se R.L. de C.V." *Id.* Text below the signature blocks reads "**SIGNATURES CONTINUED ON NEXT PAGE**." *Id.*

The next page begins "**SIGNATURES CONTINUED FROM PREVIOUS PAGE**." *Id.* at 7. In place of where "BORROWER" appeared on the prior page, text reads "**HOVDE**." *Id.* Steven Hovde's signature follows. *Id.* Text on the bottom of the page reads, "**SIGNATURES CONTINUED ON NEXT PAGE**." *Id.*

However, the next page does not contain any additional signatures. Instead, it includes a paragraph titled, "**SCHEDULE A LEGAL DESCRIPTION OF THE PROPERTY**." *Id.* at 8.

As the Hovdes point out, Steven Hovde's signature appeared underneath a heading titled, "**HOVDE**," not "Steven D. Hovde." *Id.* at 7. The first page of the loan agreement defines "Hovde as follows: "Eric D. Hovde and Steven D. Hovde are sometimes hereafter referred to as 'Hovde.'" *Id.* at 1. The agreement refers to the parties as "Borrower" and "Hovde" at various times. *See, e.g.*, *id.* at 2, 3.

Because of that definition, the Hovdes believe that "it follows that Steven Hovde signed the Forbearance Agreement on behalf of both of them." *See* Pls.' Resp., at 9 (Dckt. No. 15). But in Freud's view, the fact that the bottom of the signature page includes the words

23

"SIGNATURES CONTINUED ON NEXT PAGE" disproves the Hovdes' argument. *See* Defs.'
Reply, at 8 (Dckt. No. 19).

On the one hand, it seems odd that the signature page would simply say "HOVDE,"
rather than specifying *which* Hovde, if the parties intended for two Hovdes to sign the
forbearance agreement. That language could confusion and misplaced signatures.

On the other hand, it seems odd that the page signed by Steven Hovde states
"SIGNATURES CONTINUED ON NEXT PAGE," when the next page has no signatures. But
then again, it is not clear from that language that the parties meant for Eric Hovde to sign.

After all, there's no blank page with a signature block for Eric Hovde. And there's no
missing page in the pagination scheme – the forbearance agreement goes from Steven Hovde's
signature on page 7 to the description of the legal property on page 8. *See* Forbearance
Agreement, at 7–8 (Dckt. No. 1-3). So, perhaps the "SIGNATURES CONTINUED ON NEXT
PAGE" was simply a cut-and-paste error.

Looking at the agreement as a whole, the Hovdes' explanation – *i.e.*, that Steven Hovde
intended to sign on both Hovdes' behalf – is plausible. Maybe it is more plausible than any other
explanation. The complaint plausibly alleges the Steven Hovde signed for both of them, so that
allegation is enough to survive a motion to dismiss.

Trying another tack, Freud argues that, if Steven Hovde did sign the forbearance
agreement for both Hovdes, then the authority for Steven Hovde to do so would "have to be in a
writing separate and apart from the forbearance agreement." *See* Defs.' Reply, at 9 (Dckt.
No. 19).

The Court declines to weigh in on the need for a separate writing at this stage of the litigation. The briefing on the issue is cursory – the Court doesn't have much to go on. If need be, the Court could consider it at a later time.

Again, the arguments seem academic. At the end of the day, it does not matter. The statute requires a new promise to pay, not a new agreement to pay. And here, the forbearance agreement included a new promise to pay. That's enough.

**Conclusion**

For the foregoing reasons, Defendants' motion to dismiss is denied.

Date:  July 29, 2024

_____

Steven C. Seeger
United States District Judge